# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————————

## EON CORP. IP HOLDINGS LLC,

*Plaintiff-Appellant*,

v.

## AT&T MOBILITY LLC,

*Defendant-Appellee.*

———————————————

2014-1392

———————————————

Appeal from the United States District Court for the
District of Delaware in No. 1:13-cv-00910-RGA,
Judge Richard G. Andrews.

-------------------------------------------------------------------

*(caption continued on inside cover)*

———————————————

## CORRECTED INITIAL BRIEF FOR DEFENDANT-APPELLEE
## AT&T MOBILITY LLC

———————————————

Thomas W. Sankey
Diana M. Sangalli
Duane Morris LLP
1330 Post Oak Boulevard
Suite 800
Houston, TX 77056
713-402-3900

Kristina Caggiano
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
(202) 776 5284

Joseph A. Powers
Duane Morris LLP
30 South 17th Street
One Liberty Place
Philadelphia, PA 19103
(215) 979-1842

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

# EON CORP. IP HOLDINGS LLC,
*Plaintiff-Appellant,*

v.

# FLO TV INCORPORATED,
*Defendant-Appellee,*

AND

# MOBITV INC.,
*Defendant/Third Party Plaintiff/Counterclaimant-Appellee*

AND

# U.S. CELLULAR CORPORATION,
*Defendant-Appellee,*

AND

# LG ELECTRONICS MOBILECOMM U.S.A., INC.,
*Defendant/Third Party Plaintiff/Counterclaimant- Appellee,*

AND

# SPRINT NEXTEL CORPORATION, HTC AMERICA INC, QUALCOMM, INC., SIMPLEXITY, LLC D/B/A WIREFLY, AND MOTOROLA MOBILITY LLC,
*Defendants-Appellees.*

————————————

2014-1393

————————————

Appeal from the United States District Court for the District of Delaware in No. 1:10-cv-00812-RGA, Judge Richard G. Andrews.

## Certificate of Interest

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4(a), counsel for Appellee AT&T Mobility LLC certify the following:

1.    The full name of every party or amicus represented by us is:

AT&T Mobility LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

AT&T Mobility LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of any party represented by us are:

AT&T Mobility LLC is a wholly-owned direct or indirect subsidiary of its ultimate parent corporation, AT&T Inc.  AT&T Inc. is a publicly traded company and no publicly traded company owns more than 10% of its stock.

4.    The names of all law firms and the partners and associates that appeared for the parties now represented by us in trial court or are expected to appear in this Court are:

Thomas W. Sankey, Diana M. Sangalli, Wesley W. Yuan, Joseph A. Powers and Alison M. Haddock
**DUANE MORRIS LLP**

Jack B. Blumenfeld and Jennifer Ying
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

i

# **Table of Contents**

**Page**

STATEMENT OF RELATED CASES ................................................................... ix

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF ISSUE ........................................................................................1

STATEMENT .........................................................................................................2

    I.     Statutory and Historical Background ........................................................2

           A.     Functional Claiming Before § 112, ¶6 ........................................2

           B.     Congress Decides To Permit Means-Plus-Function Claiming in the 1952 Patent Act, but With a Price ...................4

    II.    The '757 Patent ........................................................................................6

           A.     The Purported "Marriage of the TV and the PC" in 1991 .........6

           B.     EON Amended the Claims To Overcome Prior Art by Adding Means-Plus-Function Elements .....................................8

    III.    Proceedings Below ................................................................................10

           A.     EON Sues Smartphone Companies, Component Providers, Mobile TV Content Providers, and Mobile Network Operators ..................................................................10

           B.     Summary Judgment Motions and Hearings.............................10

           C.     The District Court's Decision ..................................................16

SUMMARY OF ARGUMENT ..............................................................................19

STANDARD OF REVIEW ...................................................................................22

ARGUMENT .........................................................................................................23

    I.    EON's Patent Neither Discloses the Requisite Algorithm for Its Computer-Implemented Means-Plus-Function Claims nor Falls Within Any Exception ........................................................................25

ii

## Certificate of Interest

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4(a), counsel for
Appellee AT&T Mobility LLC certify the following:

1.     The full name of every party or amicus represented by us is:

       AT&T Mobility LLC

2.     The name of the real party in interest (if the party named in the caption is not
       the real party in interest) represented by us is:

       AT&T Mobility LLC

3.     All parent corporations and any publicly held companies that own 10 percent
       or more of the stock of any party represented by us are:

       AT&T Mobility LLC is a wholly-owned direct or indirect subsidiary of its
       ultimate parent corporation, AT&T Inc.  AT&T Inc. is a publicly traded
       company and no publicly traded company owns more than 10% of its stock.

4.     The names of all law firms and the partners and associates that appeared for
       the parties now represented by us in trial court or are expected to appear in
       this Court are:

       Thomas W. Sankey, Diana M. Sangalli, Wesley W. Yuan, Joseph A. Powers
       and Alison M. Haddock
       **DUANE MORRIS LLP**

       Jack B. Blumenfeld and Jennifer Ying
       **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

i

## **Table of Contents**

**Page**

STATEMENT OF RELATED CASES ................................................................. ix

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF ISSUE ..........................................................1

STATEMENT ..........................................................2

    I.     Statutory and Historical Background ....................................2

         A.     Functional Claiming Before § 112, ¶6 ........................2

         B.     Congress Decides To Permit Means-Plus-Function Claiming in the 1952 Patent Act, but With a Price....................4

    II.    The '757 Patent ..........................................................6

         A.     The Purported "Marriage of the TV and the PC" in 1991 .........6

         B.     EON Amended the Claims To Overcome Prior Art by Adding Means-Plus-Function Elements ...................8

    III.    Proceedings Below ..........................................................10

         A.     EON Sues Smartphone Companies, Component Providers, Mobile TV Content Providers, and Mobile Network Operators ..........................................................10

         B.     Summary Judgment Motions and Hearings .............................10

         C.     The District Court's Decision ..................................16

SUMMARY OF ARGUMENT ..........................................................19

STANDARD OF REVIEW ..........................................................22

ARGUMENT ..........................................................23

    I.    EON's Patent Neither Discloses the Requisite Algorithm for Its Computer-Implemented Means-Plus-Function Claims nor Falls Within Any Exception ..........................................................25

A.   EON Concedes That It Fails To Satisfy the General Rule: The '757 Patent Discloses No Algorithms ...............................26

B.   EON Concedes That the Claimed Functions in the '757 Patent Are Not Coextensive With a Microprocessor, and so the Claim Terms Cannot Fall Within *Katz*'s Exception to the Algorithm Requirement ..................................................28

  1.   *Katz* Recognized an Exception for Functions "Coextensive" With a General-Purpose Computer ........29

  2.   EON's Claims Fall Outside the *Katz* Exception Because They Are Not Coextensive With a General-Purpose Computer .....................................................................31

  3.   EON's "Proposed" Distinction Between "Some" Programming and "Special" Programming Fails ..........34

C.   EON's Arguments Regarding Courts' Supposedly Different Interpretations of *Katz* Are Irrelevant ......................39

II.   EON Cannot Rely on the Person Skilled in the Art To Supply the Algorithmic Structure It Has Failed To Disclose.........................42

A.   EON Fundamentally Misconstrues the Role of the Person Skilled in the Art....................................................................43

B.   EON's Argument That a Person Skilled in the Art Could Custom Write a Program Confuses Definiteness With Enablement...............................................................................45

C.   Relying on the Person Skilled in the Art To Supply the Necessary Algorithm Eviscerates the Means-Plus-Function Bargain...............................................................49

III.   EON's Contrary Arguments Fail ......................................................51

A.   EON's Arguments Demonstrate Why an Algorithm Is Required .....................................................................................52

B.   The Supreme Court's *Nautilus* Decision Does Not Alter the Analysis....................................................................................56

IV.    EON Relied on the Novelty of the Claimed Functions To Gain
       Allowance During Reexamination .......................................................58

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................59

# Table of Authorities

## Cases

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324
(Fed. Cir. 2006)........................................................................... 26, 43

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521
F.3d 1328 (Fed. Cir. 2008) ....................................................... passim

*Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374 (Fed.
Cir. 1999) .................................................................................. passim

*Biomedino, LLC v. Waters Techs*, 490 F.3d 946 (Fed. Cir.
2007) .................................................................................................5

*Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed.
Cir. 2009) .................................................................................. passim

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir.
1998) ...............................................................................................23

*Elan Microelectronics Corp. v. Pixcir Microelectronics Co.
Ltd.*, No. 2:10-cv-00014, 2013 WL 2394358 (D. Nev. May
30, 2013) .........................................................................................38

*Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361
(Fed. Cir. 2012)................................................................ 6, 28, 39, 41

*Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir.
2008) ...............................................................................................43

*Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364
(1938)................................................................................................4

*Halliburton Energy Servs., Inc. v. MI LLC*, 514 F.3d 1244 (Fed.
Cir. 2008) ..........................................................................................5

*Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1
(1946) ................................................................................. 2, 3, 4, 49

*Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005) ............................43

*In re Katz Interactive Call Processing Litig.*, 639 F.3d 1303 (Fed. Cir. 2011) ......................................................... passim

*Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) ...........................................................55

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ...........................................................23

*Med. Instr. & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) ................................................ 43, 49, 50

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) ...................................................................... passim

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) ................................................................. 23, 27

*Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302 (Fed. Cir. 2012) ...................................................................... passim

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294 (Fed. Cir. 1999) ...........................................................23

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005) ...........................................................23

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) ...........................................................27

## Statutes

28 U.S.C. § 1295(a)(1) ................................................................1

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1338 .........................................................................1

35 U.S.C. § 112 ..................................................................... 11, 23

35 U.S.C. § 112, ¶ 6 ............................................................. passim

## Other

Mark A. Lemley, *Software Patents and the Return of
  Functional Claiming*, 2013 Wis. L. Rev. 905 (2013) .......................2, 4

## <u>Table of Abbreviations</u>

### <u>Parties</u>

EON                          Plaintiff-Appellant EON Corp. IP Holdings LLC

### <u>Patent-at-Issue</u>

The '757 Patent             U.S. Patent No. 5,663,757

### <u>Defined Terms</u>

A____                        Joint Appendix at page(s) ____

AIA                          The America Invents Act, Pub. L. 112-29 (2011)

§ 112, ¶ 6                   35 U.S.C. §112, ¶ 6 (pre-AIA)

EONBr. ____                  EON's Opening Brief at page(s) ____

## <u>STATEMENT OF RELATED CASES</u>

This action, *EON Corp. IP Holdings, LLC v. AT&T Mobility LLC*, No. 2014-1392, is an appeal from the United States District Court for the District of Delaware in No. 1:13-cv-00910-RGA, Judge Richard G. Andrews.  A related action, *EON Corp. IP Holdings, LLC v. FLO TV Inc.*, No. 2014-1393, is an appeal from the United States District Court for the District of Delaware in No. 1:10-cv-00812-RGA, also before Judge Richard G. Andrews.  The cases were consolidated before the district court for purposes of claim construction.  (A160.)  By this Court's May 13, 2014 Order (D.I. 22 in No. 14-1392), Appeal Nos. 2014-1392 and 2014-1393 are considered companion cases and are assigned to the same merits panel for oral argument.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338. This Court has exclusive jurisdiction over this appeal from the district court's final judgment of invalidity under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUE

Whether the district court correctly found claims 1-10 of the '757 Patent indefinite where the parties agreed that (i) each independent claim includes at least one means-plus-function term for a computer-implemented software function, (ii) the specification of the '757 Patent fails to disclose a corresponding algorithm for programming a computer to perform any of these functions, (iii) these functions could not be performed by a general-purpose computer without writing additional customized software, and (iv) each function could be programmed in multiple different ways.

1

## STATEMENT

This case concerns computer-implemented means-plus-function terms under 35 U.S.C. § 112, ¶ 6 for which no corresponding algorithms are disclosed in the patent specification.[1]

## I.    Statutory and Historical Background

### A.    Functional Claiming Before § 112, ¶ 6

Before the Supreme Court's decision in *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946), patent applicants had increasingly turned to functional claiming to enlarge the scope of their claims. *See* Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 Wis. L. Rev. 905, 914 (2013).   Rather than claiming a specific (and innovative) way of implementing a function, applicants claimed the function itself, without tethering it to any structure or device. *Id.*  For example, the inventor of an engine would not claim the physical design itself, or all engines sharing its critical design characteristics.  Rather, the inventor would claim the engine's functions – "a means for generating horsepower" – and then apply the resulting patent to *any* and *all* engines capable of performing that function. *Id.*  By doing so, the patentee

---

[1]    As part of the AIA, § 112, ¶ 6 was re-labeled as § 112(f).  The AIA did not effect any substantive change to this provision. *See* 35 U.S.C. § 112, 2011 Historical and Revision Notes.  For consistency, when citing to § 112, ¶ 6, and the other provisions of § 112, Appellees will use the pre-AIA convention of § 112, ¶ __.

could claim an exclusive right not merely to what he invented, but all substitutes for that invention – everything that could serve the same function. *Id.*

The Supreme Court put an end to that practice in a series of cases that culminated in *Halliburton*. The invention at issue there involved an acoustic device that used sound waves to measure the distance to an underground oil reserve, information that could be used to access the reserve more efficiently. *See* 329 U.S. at 4-8. The patent appeared to claim an advance over prior art in acoustic tuning, but described that advance solely by describing its function (*e.g.*, "means associated with said pressure responsive device for tuning said receiving means to the frequency of echoes from the tubing collars of said tubing sections to clearly distinguish the echoes from said couplings from each other"). *Id.* at 8-9. As the Supreme Court explained, the "claim thus describes this most crucial element in the 'new' combination [invention] *in terms of what it will do rather than in terms of its own physical characteristics or its arrangement* in the new combination apparatus." *Id.* at 9 (emphasis added). Moreover, the Court explained, nowhere in the specification "was there any indication that the patentee contemplated any specific structural alternative." *Id.* at 11-12.

The Court rejected the claim for want of definiteness and an adequate written description. The Court previously had observed that the "limits of a patent must be known for the protection of the patentee, the encouragement of the

3

inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public." *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938). The purely functional claims in the patent in *Halliburton*, the Court stated, undermined those goals. "What he claimed in the court below and what he claims here is that his patent bars anyone from using in an oil well any device heretofore or hereafter invented which combined with the [prior art] machine *performs the function of* clearly and distinctly catching and recording echoes from tubing joints with regularity." 329 U.S. at 12 (emphasis added). That would foreclose a whole field of innovation: "The Halliburton device, alleged to infringe, employs an electric filter for this purpose. In this age of technological development there may be many other devices beyond our present information or indeed our imagination which will perform that function and yet fit these claims." *Id.* The Court refused to allow such claiming. A "patentee cannot obtain greater coverage by failing to describe his invention," the Court stated, "than by describing it as the statute commands." *Id.* at 13. The *Halliburton* decision is credited with having effectively done away with functional claiming. *See* Lemley, 2013 Wis. L. Rev., at 915.

## B. Congress Decides To Permit Means-Plus-Function Claiming in the 1952 Patent Act, but With a Price

Congress addressed the *Halliburton* decision in the 1952 Patent Act. It decided to allow patentees to use claims that recite a means for performing a

function without reciting a corresponding structure in the claims, *so long as* a corresponding structure that performs the claimed function is disclosed in the specification:

> An element in a claim for a combination *may be expressed as a means or step for performing a specified function* without the recital of structure, material, or acts in support thereof, *and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.*

35 U.S.C. § 112, ¶ 6 (emphasis added).  As this Court observed, in § 112, ¶ 6, the 1952 Patent Act thus "authorized functional claiming, but with limits." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244,1256 n.7 (Fed. Cir. 2008).  In particular, where a claim is expressed in functional terms, its scope "is limited to structure disclosed in the specification and equivalents," and "if no structure is disclosed, the claim is indefinite."  *Id.* (citing *Biomedino, LLC v. Waters Techs*, 490 F.3d 946, 950 (Fed. Cir. 2007)).  "This statutory provision was meant to preclude the overbreadth inherent in open-ended functional claims . . . which effectively purport to cover any and all means so long as they perform the recited functions."  *Id.*

        This Court has addressed the operation of § 112, ¶ 6 where the specification discloses that a means-plus-function term is implemented by a computer.  Because computers can be programmed to achieve a particular result by myriad means, the Court has held that the specification must explain how the

5

computer performs the claimed function. This software explanation, commonly referred to as an "algorithm," is part of the structure for a computer-implemented means-plus-function term. *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333-35 (Fed. Cir. 2008) ("control means" term indefinite where the only structure disclosed in the specification was a computer-based machine with "appropriate programming"). The algorithm requirement both ensures that the public is on notice of what infringes and avoids a return to purely functional claiming for computer-implemented (as opposed to purely mechanical) devices. *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012).

## II.    The '757 Patent

### A.    The Purported "Marriage of the TV and the PC" in 1991

According to EON, the '757 Patent was the "marriage of the TV and the PC." (A275.) The application leading to the '757 Patent was filed on March 25, 1991, and the patent issued on September 2, 1997. Titled "Software Controlled Multi-Mode Interactive TV Systems," the '757 Patent identifies Fernando Morales as its sole inventor. (A1.) The specification describes a two-way interactive TV system. (A7 at col. 1:13-16.) The '757 Patent provides an example of the system that presents the interactive features to a user:

6



(A4 at Fig. 3 (emphasis added).)

According to the specification, software, depicted and highlighted above as Element 8 ("Software Program & Systems Control") in Figure 3, provides interactive functions, such as "reconfiguring the operating modes by adding or changing features and introducing new menus," where these operating modes "permit[] various degrees of interactive participation by a local subscriber, including network communication interconnection between the subscriber television receiver stations, television program viewing options, fiscal transactions and audience response modes."  (A9 at col. 6:60-64; A13-15)  The specification states that the disclosed system allows for "a wide variety of other interactive functions useful to a local subscriber [to] be supplied from a standard low cost

7

facility by means of software control." (A8 at col. 4:49-50.) Though the specification discloses that software running on a microprocessor is used to implement these various operating modes (A6 at Fig. 5; A9 at col. 6:15-17), the parties agree that the '757 Patent provides no algorithms for programming a computer to perform these functions.

The '757 Patent contains five independent claims and five dependent claims, all of which are asserted in this case. As indicated by their respective preambles, each claim is directed to a "local subscriber's data processing station for a wireless television program communication network coupling together a set of interactive subscriber television receiver stations." (A13-15.) As discussed below, all independent claims of the '757 Patent were amended during reexamination by adding computer-implemented means-plus-function terms to overcome prior art.

### B.    EON Amended the Claims To Overcome Prior Art by Adding Means-Plus-Function Elements

On May 17, 2011, Kyocera Communications, Inc. filed an *ex parte* reexamination request on each of the claims in the '757 Patent. (A535-36.) A first office action rejected all ten claims of the '757 Patent as invalid in light of the cited prior art. (A1208.) In response, EON amended independent claims 9 and 10 by introducing into an existing means-plus-function element the additional function of "reconfiguring the operating modes by adding or changing features and

8

introducing new menus." (A1220-22.)  EON argued that these additional elements

distinguished its invention over the prior art.  (A1223-27; A1229-32.)  In view of

the amendments, the Examiner allowed claims 9 and 10 but maintained the

rejections on the other eight claims.  (A1239.)

On March 22, 2012, EON "amended claim 8 to include the limitation

previously added to allowed claims 9 and 10."  (A1259.)  In particular, EON

amended claim 8 to add "means controlled by replaceable software means operable

with said operation control system for reconfiguring the operating modes by

adding or changing features and introducing new menus."  (A1266-68.)  Based on

that amendment, the Examiner allowed claim 8.  (A1344.)  EON later gained

allowance of claim 1 by adding to it the same means-plus-function element.  (*See*

A1365-66, 1375.)

In a May 1, 2012 Advisory Action, the Examiner indicated that

dependent claim 7 would be allowable if drafted in independent form.  The

Examiner cited the following claim limitation as allegedly distinguishing the prior

art:  "means under control of said replaceable software means for indicating

acknowledging of shipment of an order . . . ."  (A1344.)  EON then rewrote claim 7

as an independent claim to gain allowance.  (A1375.)

For each claim in the '757 Patent, the Examiner identified only these

specific means-plus-function limitations as distinguishing the claims from the prior

9

art and allowed the claims on this basis alone.  (*See* A1242-43 (claims 9-10); A1344 (claim 7-8); A1375-76 (claim 1).)  The reexamination certificate for the '757 Patent issued on August 14, 2012.  (A12.)  The '757 Patent was later subject to a second reexamination and confirmed with no further amendments to the claims.  (A16-17.)

## III.    Proceedings Below

### A.    EON Sues Smartphone Companies, Component Providers, Mobile TV Content Providers, and Mobile Network Operators

On September 23, 2010, EON sued 17 defendants in the U.S. District Court for the District of Delaware, alleging infringement of the '757 Patent (the "FLO TV Action").  (A47-63.)  EON subsequently sued AT&T and other defendants in the U.S. District Court for the District of Puerto Rico on June 14, 2011, alleging infringement of the '757 Patent and other patents (the "AT&T Action").  (A68-71.)  After settling with the other defendants in the AT&T Action, EON's claims under the '757 Patent against AT&T were severed and transferred to Delaware in 2013.  (A107-08.)  The claims against AT&T were then consolidated with the FLO TV Action for purposes of claim construction.  (A160.)

EON directed its infringement allegations to present-day smartphones that "deliver interactive television or television-quality entertainment and informational content to subscribers."  (A69.)  EON targeted various sets of defendants as allegedly infringing the '757 Patent, including wireless network

10

providers (*e.g.*, Sprint, AT&T, and U.S. Cellular), mobile handset companies including component suppliers (*e.g.*, HTC, Motorola Mobility, LG, and Qualcomm), and content providers (*e.g.*, MobiTV and FLO TV).  (A1408-09.)

### B.    Summary Judgment Motions and Hearings

On November 1, 2013, defendants in the FLO TV Action moved for summary judgment that all claims of the '757 Patent were invalid as indefinite under 35 U.S.C. § 112.[2]  These defendants identified the following eight computer-implemented means-plus-function claim terms as indefinite because the specification failed to disclose a corresponding algorithm:

1. "means under control of said replaceable software means for indicating acknowledging shipment of an order from a remote station" (Claim 7);

2. "means controlled by replaceable software means operable with said operation control system for . . . reconfiguring the operating modes by adding or changing features and introducing new menus" (Claims 1-6, 8-10);

3. "means responsive to said self contained software for establishing a mode of operations for selection of one of a plurality of authorized television program channels" (Claim 8);

4. "means establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels" (Claim 8);

5. "means for causing selected themes to automatically display a second menu" (Claim 8);

---

[2]    Defendants-Appellees in the FLO TV Action also brought motions for summary judgment on other grounds and to exclude the testimony of EON's expert.  Those motions were dismissed without prejudice as moot.

6.  "means controlled by replaceable software means operable with said operation control system for establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station" (Claim 9);

7.  "means controlled by replaceable software means operable with said operat[ion] control system for establishing and controlling fiscal transactions with a further local station" (Claim 10); and

8.  "means for establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station" (Claim 10).

(A408-11.)  The district court held a claim construction hearing on January 8, 2014, and a summary judgment hearing on January 9, 2014.  The district court then held a half-day hearing on February 5, 2014, to receive expert testimony regarding the computer-implemented terms.

EON agreed with Defendants on a number of key issues regarding these eight means-plus-function terms.  The parties agreed that all were means-plus-function terms governed by § 112, ¶ 6.[3]  The parties agreed that each of terms 1-8 was implemented by a computer, and that the structure disclosed in the

---

[3]   EON disputed below that terms 2 and 3 were means-plus-function terms governed by § 112, ¶ 6.  The district court held against EON on this issue (A1714), and EON does not challenge this finding on appeal.

specification for each of these functions was a microprocessor.[4]  The parties also agreed on the claimed function for each term.[5]

The parties' technical experts agreed on a number of additional issues. First, the experts agreed that the recited functions could *not* be implemented on a general-purpose processor without additional programming.  Both technical experts also agreed that to perform these functions, one would have to write software programs from scratch.  Specifically, EON's expert, Dr. Sauer, testified:

> Q:    Programming to accomplish the agreed function of Claim Term 15 requires additional programming, we've agreed on that?
>
> Dr. Sauer: *To introduce the menus requires additional programming.*

(A472 at 36:16-18 (emphasis added).)[6]

> Q:    Just so the record is clear, all the terms, 13, and 16 through 21, would require some additional programming to be able to perform the functions?

---

[4]  EON disputed below that term 1 was implemented by a computer; the district court held against EON on this issue (A1714-15; A1715 n.6.), and EON has dropped this issue on appeal.  (EONBr. 2.)

[5]  The parties originally disputed the function for term 4, but Defendants argued the term was indefinite under any of the proposed functions.  (A1723-24.)  The district court adopted EON's proposed function for this term and found it indefinite.  *Id.*

[6]  Terms 1-8 at issue on this appeal were referred to as terms 13 and 15-21, respectively, before the district court.  The following list shows the appellate term numbers used in this brief with the corresponding district court numbers in parentheses:  1 (13); 2 (15); 3 (16); 4 (17); 5 (18); 6 (19); 7 (20); and 8 (21).

> Dr. Sauer: *[Terms] 13, 16, 17, 18, 20, and 21 would all require additional programming.*

(*Id*. at 33:16-23 (objection omitted and emphasis added).) [7]

Second, the experts agreed that the '757 Patent fails to disclose any corresponding algorithm for the recited functions:

> Q:     Are you aware, sir, that the parties have agreed that there's no algorithm described in the '757 patent for any of the computer-implemented functions?
>
> Dr. Sauer:   I'm not specifically aware that the parties have agreed to that, but that seems to be a sensible agreement.
>
> Q:     All right.  And, so, you don't disagree with it, do you?
>
> Dr. Sauer:   I do not find algorithms, per se, with regard to these claim terms.

 (A477 at 53:24-54:7 (objection omitted).)  Defendants' expert, Dr. Grimes, agreed that no algorithm was disclosed.  (*See* A482 at 75:17-22; A485 at 85:12-15.)

Third, the experts agreed that, in the absence of such an algorithm, there would have been multiple ways to program the claimed functions at the time of invention:

---

[7]    In omitting term 19 (appellate term 6) in this passage, either Dr. Sauer misspoke or there was a transcription error.  Dr. Sauer testified at deposition that a general-purpose computer could not perform the function of this term without additional programming.  (*See* A523-24 n.1; A1590 at 69:14-21; *see also* A1587 at 27:7-16; 28:16-22; 29:8-12 (all terms).)

> Q:    But,  sir,  it's  true,  even  within  a  Windows
> environment, that there are multiple ways to program, for
> example, a menu?
>
> Dr. Sauer: In a Windows environment there are multiple
> ways to program a menu.

(A474 at 41:17-20; *see also id*. at 42:7-43:10 (citing Petzold treatise (A1596-1619)

and noting that it showed three ways to program a menu).)  Indeed, Dr. Sauer

testified that "it would be rare . . . that two programmers would write things

identically":

> Q:  Sir, it's true that not every programmer is going to
> write a computer program the same way?
>
> Dr. Sauer:  Different programmers have different styles
> of how they want to do things.  Every person has their
> own  probably  fairly  unique  style  for  exactly  how  they
> write a program.

(A474 at 44:3-12.)

Lastly, the experts agreed that at the time of invention, no

commercially available program existed that could perform any of these functions.

(A473 at 38:8-39:7 (Dr. Sauer); A479 at 63:12-17 (Dr. Grimes).)

In light of these agreements, Defendants argued that the computer-

implemented terms were indefinite because each required computer programming

for which no algorithm was disclosed.  (A405-07.)  EON argued that the

definiteness inquiry should focus on the complexity of the recited function in view

of the knowledge of one of ordinary skill in the art.  If a person of ordinary skill

15

could write the appropriate code to perform the function, then according to EON, no algorithm need be disclosed.  (A457.)

### C.    The District Court's Decision

The district court, after conducting three days of hearings and receiving multiple rounds of briefing, issued an opinion invalidating each of the claims of the '757 Patent as indefinite.  (A1706-28.)  Applying this Court's decision in *In re Katz Interactive Call Processing Litigation*, 639 F.3d 1303 (Fed. Cir. 2011), the district court considered the capabilities of a general-purpose computer along with commercially available software to determine if the § 112, ¶ 6, requirements were met.  (A1714-19.)  For each means-plus-function element at issue, the district court found that "EON's proffered structure is legally insufficient to sustain the term's validity because a general purpose computer in 1991 could not, without special programming, perform the claimed function and no algorithm was disclosed."  (A1715.)

The district court found that the claimed functions "could not be performed by a computer purchased 'off-the-shelf.'" (*Id*.)  The district court further found that "off-the-shelf software in 1991 would not have been capable of performing the claimed function either." (A1716.)  The district court confirmed each of these findings by citing specific testimony from both Defendants' expert and Plaintiff's expert regarding the inability of a computer to implement any of the

functions "off-the-shelf," even if it had been loaded with off-the-shelf software. (A1715-17; A1720-22.)  As a result, the district court found that "special code would have to be written in order to accomplish the claimed functionality." (A1716; *see also* A1719-28.)  Based on its finding that special code had to be written for each of the functions, the district court concluded that *Katz*'s exception to the algorithm disclosure requirement did not apply.  (A1717-19.)  Agreeing with all of the parties and their experts that the '757 Patent discloses no algorithm, the district court invalidated each of the pending claims as indefinite.  (A1717-28.)

        The district court explained that sound policy reasons supported its decision.  In particular, the district court found that without "disclosing the algorithm, the public is left without any knowledge of how to carry out the performed function."  (A1718.)  That "is particularly true," the court explained, where, as here "there are numerous ways to write even the most simple of computer programs."  (*Id.*)  The district court further addressed EON's argument that the lack of disclosure is not important when a person of ordinary skill could easily write code to perform the recited function.  (A1718-19.)  The district court explained that this argument was "inconsequential" because the issue "is not whether a PHOSITA could write the necessary computer program," but whether the patentee had disclosed the means of achieving the function it intended to claim.  (A1719.)  Without "disclosing the algorithm," the district court found that EON

17

had not provided the definiteness required "in exchange for patent protection."

(*Id.*)  The district court thus entered a final judgment of invalidity on March 5, 2014 in the FLO TV Action. (A40; A42; A1620.)  On March 18, 2014, in accordance with a joint stipulation of EON and AT&T, the district court entered a final judgment of invalidity in the AT&T Action.  (A1729; A43; A46.)  EON brought this appeal.

## SUMMARY OF ARGUMENT

EON's attempts to evade the requirements of § 112, ¶ 6 should be rejected and its appeal to overturn the district court's invalidation of the '757 Patent denied.  The parties agree on a number of critical issues here:  (i) the claim elements at issue on appeal are all means-plus-function elements governed by § 112, ¶ 6; (ii) the corresponding structure for each element is a processor along with necessary programming; (iii) the specification in the '757 Patent discloses no algorithms at all; (iv) software would need to be written to implement each of the claimed functions; and (v) each function could be programmed in multiple different ways.

I.     Given these points of agreement, well-settled precedent requires that the claims be invalidated as indefinite because the specification fails to disclose a corresponding algorithm for the computer-implemented means-plus-function elements.  Section 112, ¶ 6 allows functional claiming but limits the scope of the claimed functions to the corresponding structures disclosed in the specification.  In cases such as this one that involve computer-implemented means-plus-function terms, "this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  EON's claim elements fail this requirement.

19

Recognizing this defect, EON urges that its claims fall within the exception to the algorithm disclosure requirement this Court recognized in *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011). In *Katz*, this Court held that an algorithm is not required in one discrete circumstance: where the claimed function is "coextensive" with the corresponding structure, *i.e.* a general-purpose processor. EON cannot meet that standard, however, because it concedes that the claim functions at issue on this appeal require specific programming to be implemented and thus cannot be "coextensive" with a general-purpose processor.

EON attempts to salvage its claims by arguing that the *Katz* exception should be radically expanded. EON urges that *Katz*'s exception to the algorithm requirement should turn on a "distinction between *some* programming that is routine and *special* programming," (EONBr. 51), and that if a function would only require "*some* routine programming" to implement (*id.* at 44) – programming it describes as "very basic" or "elementary" (*id.* at 50) – an algorithm need not be disclosed.

But EON's argument is contrary to the requirements of the statute and this Court's precedent. Because a computer can be programmed to perform functions in many ways, "the public is left to guess" as to the scope of the claims when the specification fails to provide a corresponding algorithm. *Katz*, 639 F.3d

20

at 1315.  Thus, "by claiming a processor programmed to perform a specialized function without disclosing the internal structure of that processor in the form of an algorithm," the claims "exhibit the overbreadth inherent in open-ended functional claims" and fail for "indefiniteness."  *Id.*

II.    EON nevertheless urges that "the bounds of the computer-implemented means-plus-function terms in the '757 [Patent] were definite," even without disclosure of an algorithm, "because a person skilled in the art would understand the structure of those terms as the microprocessor disclosed in the '757 Patent and a routine, well-settled method within the art that even a person of elementary skill would understand and could implement."  (EONBr. 49.)  This Court, however, has rejected that precise argument, holding in case after case that it "is not enough for the patentee simply to state or later argue that," without an algorithm, "persons of ordinary skill in the art would know what structures to use to accomplish the claimed function."  *Aristocrat*, 521 F.3d at 1334, 1337.  Indeed, the Court has explained that such attempts to outsource the algorithm to the hypothetical knowledge of a person skilled in the art violates the basic principles underlying § 112, ¶ 6's functional-claiming "*quid pro quo*," *see Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999) , and erroneously "conflates" the definiteness inquiry with enablement, *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384-85 (Fed. Cir. 2009).

21

III.    EON's arguments to the contrary fail.  EON repeatedly invokes its expert's testimony that "a person skilled in the art would utilize routine, settled algorithms known in the art to implement the functions at issue in this case." (EONBr. 54*; see also id.* at 49-50.)  Yet EON cannot explain how that testimony satisfies the definiteness inquiry – it does not identify which of the supposedly routine, settled algorithms that potentially could be used to implement the functions are covered by its claims, and which are not.  And while EON urges that the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), reiterated the importance of the viewpoint of one skilled in the art to the definiteness analysis, that case did not address means-plus-function claiming under §112, ¶6 and nothing in it calls this Court's well-settled precedent into question.

IV.    Finally, it should be noted that some of the functions that EON urges could be implemented using programming methods that were "well-known," "well-settled," and "elementary" at the time of the patent application are the very same functions EON urged were novel to gain allowance during reexamination. For that reason, too, EON's arguments should be rejected.

## STANDARD OF REVIEW

The Court reviews a grant of summary judgment *de novo*, reapplying the standard that the district court employed.  *Rodime PLC v. Seagate Tech., Inc.*,

174 F.3d 1294, 1301 (Fed. Cir. 1999).  Claim construction, including construction of means-plus-function claim terms, is a question of law over which the Court exercises plenary review.  *Net MoneyIN, Inc. v. VeriSign*, *Inc.*, 545 F.3d 1359, 1365 (Fed. Cir. 2008) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) and *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*)).  Indefiniteness under 35 U.S.C. § 112 is also a question of law subject to plenary review.  *Net MoneyIN*, 545 F.3d at 1365 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338 (Fed. Cir. 2005)).

## **ARGUMENT**

EON would turn back the clock 75 years, reintroducing pure functional claiming and exponentially expanding the scope of software patent claims.  In the 1940s, the Supreme Court in *Halliburton* rejected attempts by clever patent lawyers to claim pure functions, untethered to any actual device.  The Patent Act of 1952 revived a form of functional claiming, but with a price:  the patentee was limited to the structures disclosed in the specification.  In the digital world, computers often perform the functions of these means-plus-function terms.  Because computers can be programmed in many different ways to perform the same function, this Court has long held that simply disclosing "a computer" as the structure is insufficient; the patentee must also disclose an algorithm.

Here, everyone – including EON, its expert, and the district court – agrees on the fundamental issues:

- each of the disputed means-plus-function terms describes a computer-implemented function;

- none of these functions can be performed by the disclosed structure of a general-purpose processor standing alone;

- software would have to be written to instruct the general-purpose processor to perform these functions;

- the patent discloses no algorithm for writing that software; and

- there are multiple ways to write that software.

Those undisputed facts put this case squarely within this Court's precedents on computer-implemented means-plus-function terms. And those cases plainly indicate that the claim terms here are indefinite. EON would rewrite that jurisprudence to allow purely functional claiming for computers, without requiring disclosure of an algorithmic structure, so long as one of ordinary skill in the art could custom tailor from scratch computer programs to perform the functions. Essentially, EON would inject a person of ordinary skill to fill the void left by the failure to disclose, and limit the patent to, any algorithm. But this Court has repeatedly rejected that very argument, holding that where no algorithm is disclosed, one of ordinary skill cannot bridge the gap left by the patentee's failure to uphold its end of the § 112, ¶ 6 bargain.

24

I. **EON's Patent Neither Discloses the Requisite Algorithm for Its Computer-Implemented Means-Plus-Function Claims nor Falls Within Any Exception**

The asserted claims all recite computer-implemented means-plus-function terms, each of which must be supported by a disclosed algorithm within the '757 Patent's specification. EON agrees that no such algorithms are disclosed. And while a lone exception to this rule exists, the exception requires that the claimed functions be coextensive with a general-purpose computer. EON admits that none are.

Section 112, ¶6 strikes a specific bargain: on the one hand, patentees may claim their inventions in functional terms. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999). On the other hand, the specification must disclose the *structure* used to achieve that function, and the patent is limited to the disclosed structures. *Id.* at 1381-82. If the patent fails to disclose the structure, the claim is indefinite. Because each of the claim terms fails this threshold requirement, EON instead seeks to evade – indeed, eliminate – that bargain. This Court should affirm the judgment below, and find the '757 Patent invalid because each of these claim terms is indefinite for lack of the disclosed structure.

**A.    EON Concedes That It Fails To Satisfy the General Rule:  The '757 Patent Discloses No Algorithms**

Construction of a means-plus-function limitation involves two steps:  "First, the court must determine the claimed function.  Second, the court must identify the corresponding structure in the written description of the patent that performs the function."  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (internal citation omitted).  In cases such as this one "involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor."  *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

As EON acknowledges (EONBr. 40-42), the rationale for that rule is simple:  "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6."  *Aristocrat*, 521 F.3d at 1333.  "Thus, in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer

26

programmed to perform the disclosed algorithm.'" *Id.* (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)).  As a result, the general rule is that "a means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008).  That rule is essential "to avoid pure functional claiming" for computer-implemented inventions.  *Aristocrat*, 521 F.3d at 1333.  Claims that fail to disclose the required algorithm are indefinite. *See Noah Systems, Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

There is no dispute that the '757 Patent's claims at issue are means-plus-function claims.  The district court found, and EON does not dispute on appeal, that the structure disclosed in the specification for each of the means-plus-function claims at issue is a microprocessor or general-purpose computer.  (*See* A1714-15, 1714-15, 1722-28.)  EON, moreover, has never disputed that its patent fails to disclose an algorithm for performing any of the claimed functions at issue. *See id.*  Indeed, its expert acknowledged that he did "not find algorithms, per se, with regard to these claim terms" anywhere in the '757 Patent.  (A477 at 53:24-54:7.)  Consequently, absent an exception to this Court's general rule, EON's computer-implemented means-plus-function claims "are indefinite" under § 112,

¶2 for failure to "disclose[] an algorithm to perform the function associated with the limitation[s]" in the claims. *Noah*, 675 F.3d at 1319.

**B.    EON Concedes That the Claimed Functions in the '757 Patent Are Not Coextensive With a Microprocessor, and so the Claim Terms Cannot Fall Within *Katz*'s Exception to the Algorithm Requirement**

Recognizing the need to invoke an exception to the general rule, EON urges that the '757 Patent need not disclose an algorithm under *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011). The *Katz* exception, however, is a "narrow" one. *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012). In *Katz*, this Court addressed the limited circumstance in which the claimed function is "coextensive" with the disclosed structure of a general-purpose processor. In that scenario, *Katz* excuses the patentee from providing an algorithm for a computer-implemented means-plus-function claim element. The *Katz* exception applies *only* where the claimed function is "coextensive" with the disclosed general-purpose microprocessor itself – *e.g.*, "processing," "receiving," and "storing." *Katz*, 639 F.3d at 1316. These elements that are "coextensive" with the disclosed structure do "not run afoul of the rule against purely functional claiming" because the disclosed processor is *by itself* enough to perform the function. *Id*. EON does not, and cannot, argue that the functions described in its claims are "coextensive" with the general-purpose processor it disclosed. Instead, EON attempts to twist *Katz*'s straightforward

28

proposition to argue that so long as one of ordinary skill in the art *could write* "very basic," "routine," or "elementary" software – in this case, purely hypothetical software described nowhere in the Patent – to implement the function on the disclosed processor, the claim is definite.  (EONBr. 50.)  EON's argument directly contradicts the holding in *Katz*.  Accordingly, EON's claims fail for indefiniteness under § 112, ¶ 2.

### 1.    *Katz* Recognized an Exception for Functions "Coextensive" With a General-Purpose Computer

The patents in *Katz* related to interactive telephone call processing systems, and contained a number of computer-implemented means-plus-function terms, including a "means for processing" and a means for "condition[ally] coupling" calls.  *Katz*, 639 F.3d at 1314.  The specification, however, disclosed only a general-purpose processor as the corresponding structure.  *Id*. at 1316.  The district court had held that all of the claims were invalid for indefiniteness under this Court's precedents because "the patents at issue disclosed only general purpose processors and did not disclose the algorithms that those processors used to perform the recited functions."  *Id*. at 1314.

Reviewing the district court's decision, this Court divided the disputed claims into two sets.  The first set contained the means-plus-function element for "condition[ally] coupling" calls.  *Id*. at 1315.  That element, the Court found, clearly recited a "specialized function" that a general-purpose computer would

29

have to be programmed to perform. *Id*. Because a computer "can be programmed to conditionally couple calls in many ways," however, "[w]ithout any disclosure as to the way *Katz*'s invention conditionally couples calls, the public is left to guess" as to the scope of the claims. *Id*. Thus, the Court found that, "by claiming a processor programmed to perform a specialized function without disclosing the internal structure of that processor in the form of an algorithm," the claims "exhibit the overbreadth inherent in open-ended functional claims" and fail for "indefiniteness." *Id*. (quotation marks omitted).

The Court, however, viewed the second set of claim elements, including "means for processing," "receiving," and "storing," differently. According to the patentee, "'processing' meant nothing more specific than 'processing.'" *Id.* at 1317. Processing, of course, is something general-purpose *processors* inherently do; thus, the term would not "involve[] specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions." *Id.* at 1316. Because the claimed functions could be coextensive with the structure of the disclosed general-purpose processor, no algorithm need be disclosed. *Id.*

The defendants in *Katz*, though, argued that the "processing" function "was limited to the specific functions disclosed in the specifications," which would

30

require the disclosure of a corresponding algorithm. *Id.* at 1317. Because the

district court had not previously decided whether the term "processing" was so

limited, this Court remanded the case for further proceedings, instructing the

district court to "determine whether the functions recited . . . can be performed by a

general purpose processor or, instead, constitute specific computer-implemented

functions as to which corresponding algorithms must be disclosed." *Id*.

2.    **EON's Claims Fall Outside the *Katz* Exception Because They Are Not Coextensive With a General-Purpose Computer**

The claim elements of the '757 Patent at issue do not meet the

requirements for *Katz*'s narrow exception to the algorithm requirement. Instead,

they recite a number of specialized computer-implemented functions that change

the configuration, operation, or appearance of an interactive television system to

achieve what EON described as the "marriage of the PC and TV." This is not a

routine or elementary matter today, much less in 1991 when EON filed its

application. The functions in each term are italicized below:

- "means under control of said replaceable software means for *indicating acknowledging shipment of an order from a remote station*";

- "means controlled by replaceable software means operable with said operation control system for . . . *reconfiguring the operating modes by adding or changing features and introducing new menus*";

31

- "means responsive to said self contained software for *establishing a mode of operation for selection of one of a plurality of authorized television program channels*";

- "means *establishing a first menu directed to different interactively selectable program theme subsets available from said authorized television program channels*";

- "means for *causing selected themes to automatically display a second menu*";

- "means controlled by replaceable software means operable with said operation control system for *establishing and controlling a mode of operation that records historical operating data of the local subscriber's data processing station*";

- "means controlled by replaceable software means operable with said operat[ion] control system for *establishing and controlling fiscal transactions with a further local station*"; and

- "means for *establishing an accounting mode of operation for maintaining and reporting fiscal transactions incurred in the operation of the local subscriber's data processing station.*"

(A13-15; A1714; A1719-20; A1722-28.)  It cannot plausibly be suggested that these elements describe a basic function of any general-purpose computer, such as "'processing,' 'receiving,' and 'storing,'" that could be characterized as "coextensive with" the "general purpose processor" so as to fall within the *Katz* exception.  *Katz*, 639 F.3d at 1316.

Nor does EON attempt to make that argument.  In fact, EON has conceded that these functions are *not* "coextensive" with a general-purpose processor.  The parties agree that a general-purpose processor – the only corresponding structure disclosed in the '757 Patent – cannot perform any of these

32

functions alone.  Instead, the parties agree that software for each function must be specially created, installed on, and executed by the disclosed processor to perform each function.  EON's own expert, Dr. Sauer, "openly admitted that a person skilled in the art would have to employ common, elementary programming to enable the functions-at-issue."  (EONBr. 21; *see, e.g.,* A472 at 36:16-18 (Dr. Sauer:  "To introduce the menus requires additional programming.").)  While Dr. Sauer's candor was commendable, it is also fatal to EON's position.  The district court found, based in part on Dr. Sauer's testimony, that "a general purpose computer bought off-the-shelf in 1991 [could] not perform the function[s] in question."  (A1716.)  And while not relevant to the question of whether a function is co-extensive with a general-purpose computer, the parties' experts further agreed that no "off-the-shelf," commercially available software existed at the time of the invention that could perform these functions; rather, a programmer would have to custom write the code from scratch to implement each function.  (*Id.*)  The named inventor, Fernando Morales, testified that he employed "hundreds of engineers" for this very purpose.  (A1625 at 64:18-25.)

Based on these undisputed points alone, the claimed functions fall outside the *Katz* exception because they are not "coextensive" with the general-purpose processor EON disclosed in the '757 Patent.  And *Katz* further shows precisely why EON's claims are invalid – they exhibit the same defects as the

"conditional coupling" claims *Katz* found to be indefinite.  In *Katz*, this Court held that the "conditional coupling" claims were indefinite because a computer "can be programmed to conditionally couple calls in many ways"; thus, "[w]ithout any disclosure as to the way *Katz*'s invention conditionally couples calls, the public is left to guess" as to the scope of the claims.  639 F.3d at 1315; *see* pp. 29-31, *supra*. Likewise here, the '757 Patent claims require "a processor programmed to perform . . . specialized function[s]," 639 F.3d at 1315 – specialized functions like "reconfiguring the operating modes by adding or changing features and introducing new menus" – that can be achieved in various ways.  Because the '757 Patent does not "disclose[] the internal structure of that processor in the form of an algorithm," however, "the public is left to guess" as to the scope of the claims.  *Id.* As a result, like the conditional coupling claims in *Katz*, the claims are invalid as indefinite.  *Id.*

### 3.    EON's "Proposed" Distinction Between "Some" Programming and "Special" Programming Fails

Unable to meet the exception identified in *Katz*, EON seeks to rewrite it.  A single line in *Katz* described the functions of "processing," "receiving," and "storing" – functions for which an algorithm is not required – as functions that "can be achieved by any general purpose computer without special programming." 639 F.3d at 1316.  Seizing on that language, EON urges that *Katz*'s exception to the algorithm requirement should turn on a "distinction between *some*

34

programming that is routine and *special* programming." (EONBr. 51.) According

to EON, if a function would only require "*some* routine programming" to

implement on a general-purpose computer (*id.* at 44) – programming it alternately

describes as "very basic" or "elementary" (*id.* at 50) – an algorithm need not be

disclosed. EON argues that the claims of the '757 Patent are not indefinite for lack

of an algorithm because, while they concededly require "some" programming to

implement, they supposedly do not require "special" programming. (*Id.* at 49-50.)

> *Katz* itself draws no such lines. Attempting to locate support for its

routine programming/special programming distinction within *Katz*, EON claims

that the "Court specifically noted" that the claim term for which the Court required

an algorithm "described a complex function that could be achieved in

fundamentally different ways." (EONBr. 46-47.) That is not true – *Katz* nowhere

remarks on the complexity of the functions at issue. Nor, as is more relevant to

EON's argument, does *Katz* make any mention of the complexity of the

programming required to implement those functions. *Katz* nowhere draws a

distinction between whether implementation of the function requires "routine

programming" or "special programming," much less suggests that whether the

patent must disclose an algorithm turns on such a distinction.

> Rather, *Katz* is clear that the exception to the algorithm requirement

turns on whether the claim recites "specific functions that would need to be

implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions." 639 F.3d at 1316; *see also id.* at 1317 (instructing district court to "determine whether the functions recited in those . . . claims can be performed by a general purpose processor or, instead, constitute specific computer-implemented functions for which corresponding algorithms must be disclosed"); *id.* ("a specific function implemented on a general purpose computer requires an algorithm"). If it does, the general-purpose processor is considered "specially programmed," and an algorithm is required. *Id.* at 1316.

The only time disclosure of a general-purpose computer is sufficient is where it requires no additional programming to perform the function – where the function is inherent in the processor itself, such as "processing," "receiving," or "storing," without further qualification – such that the function can be said to be "coextensive with the structure disclosed." *Id. Katz* excuses the patentee from disclosing an algorithm only in that limited circumstance. *Id.* at 1316-17.

EON concedes that the "'point of the [algorithm] requirement . . . is to avoid pure functional claiming.'" (EONBr. 41 (quoting *Aristocrat*, 521 F.3d at 1333) (alterations in EONBr.).) As discussed above, "general purpose computers can be programmed to perform very different tasks in very different ways." *Aristocrat*, 521 F.3d at 1333. As a result, simply disclosing a computer as the

structure designated to perform a particular function does not limit the scope of the claim to "'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Id.* That holds true regardless of whether the programming necessary to implement the recited function is "routine" or "special" (whatever the difference might be).[8]

This case illustrates the point. For example, even for the function that EON describes, in extreme shorthand, as "displaying a menu" – a drastically simplified take on a portion of one of the functions described in the claims at issue – EON's expert admits that there are multiple ways to write software to implement that function:

> Q: But, sir, it's true, even within a Windows environment, that there are multiple ways to program, for example, a menu?
>
> A: In a Windows environment there are multiple ways to program a menu.

(A474 at 41:17-20; 44:5-7 (admitting that every "person has their own probably fairly unique style for exactly how they write a program").) Indeed, the treatise he relied upon in his testimony illustrates no less than three different ways to write a program to display a simple menu. (*Id.* at 42:7-43:10 (citing the Petzold treatise (A1596-1619) and noting that it showed three ways to program a menu).) Thus,

---

[8] Although EON advocates a distinction between "routine programming" and "special programming," it nowhere explains how a court could draw a principled line between the two concepts.

37

even if the function of displaying a menu required only "very basic," "routine," or "elementary" programming to implement on a general-purpose computer (EONBr. 50), disclosing a computer in the specification in no way "limit[s] the scope of the claim to the particular structure disclosed." *Aristocrat*, 521 F.3d at 1336.

It is worth noting, moreover, that EON consistently attempts to avoid the complexity of the functions – and by extension, the programming needed to implement those functions – by re-writing them.[9]  For example, the parties agreed that the corresponding function for term 3 is "establishing a mode of operation for selection of one of a plurality of authorized television program channels." (A1722.)  But throughout its brief, EON collapses this term to "displaying a menu" or "providing a menu" with no mention of modes, authorization, or television channels.  (*See* EONBr. 15-16, 56.)  It is telling that EON's expert was forced to write software to implement even this overly simplified function.  But all that software could do was display a non-operative menu of channel names.  (*See* A476 at 52:8-20.)  EON's example did not, as required by the claimed functions and agreed to by the parties, permit selection of any "authorized television program channels" because no actual television channels (authorized or otherwise) were

---

[9] The complexity of the functions at issue here negates the persuasive effect, if any, from the district court's opinion in *Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*, No. 2:10-cv-00014, 2013 WL 2394358 (D. Nev. May 30, 2013), which related to the disclosure of a basic function.  (*See* EONBr. 47-49.)

linked to any of the displayed names.  (*Id.*)  Thus, even if this custom

programming by EON's expert were "routine," it was not programming that

achieved the function of the disputed term.

In any event, the broader point remains – no matter how "routine" the

programming required, EON's claims "exhibit the overbreadth inherent in open-

ended functional claims."  *Katz*, 639 F.3d at 1315 (internal quotation marks

omitted).  Consequently, these claim terms manifest the problem of purely

functional claiming that §112, ¶6's structure requirement is designed to redress.

For these reasons, EON's "propos[al]" to expand the *Katz* exception to cover

microprocessors that must be programmed with "routine," but undisclosed,

software should be rejected.

### C.    EON's Arguments Regarding Courts' Supposedly Different Interpretations of *Katz* Are Irrelevant

EON complains that the district court below, and this Court in *Ergo*

*Licensing LLC v. Carefusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012), have

misapplied the *Katz* exception.  This Court, EON declares, should hew to *Katz* as

the appropriate standard.  Those arguments are utterly irrelevant to this appeal.

Appellees fully agree that the *Katz* standard governs.  EON simply loses under

*Katz*.  *See* pp. 31-34, *supra*.

First, EON assails the district court's ruling that, if "the programming

required to perform the claimed function can be purchased off-the-shelf, then it is

39

ordinary programming and no algorithm is required to comply with § 112, ¶6's structure requirement." (EONBR. 43; A1717.) But what EON fails to acknowledge is that the district court, by adopting this new test, *expanded* the exception to the algorithm requirement far beyond anything *Katz* allows and still found EON's claims indefinite.

When the district court invalidated EON's claims, it analyzed whether the claims met the *Katz* exception by considering not only the capabilities of a general-purpose computer, but also any capabilities offered by commercially available software. (A1716-18.) The district court concluded that not "only could a general purpose computer bought off-the-shelf in 1991 not perform the function in question, but the experts agree that off-the-shelf software in 1991 would not have been capable of performing the claimed function either." (A1716.) Indeed, the court found that "EON implicitly conceded" that the relevant functions are more complicated than those in *Katz* "when its expert stated that no store-bought software installed on a general purpose computer in 1991" could perform the functions "without additional programming by the user." (A1718.) Thus, even under this more generous analysis – which gave EON the benefit of the implied disclosure of structure of special programming from commercially available software nowhere identified in the patent – the district court still found the claims indefinite. (A1717 ("The fact that neither a store-bought computer nor a store-

40

bought computer with store-bought software could achieve the claimed function places this case outside of the *Katz* exception.").)  This Court can and should affirm the district court's judgment, as EON loses even if one extends *Katz* well beyond its bounds.

Second, EON argues that this Court's decision in "*Ergo Licensing* creates substantial tension with the *Katz* exception and leaves the controlling test unclear."  (EONBr. 34.)  EON suggests that *Ergo* improperly narrowed the *Katz* exception when it remarked that the function at issue in *Ergo* "requires more than merely plugging in a general-purpose computer."  673 F.3d at 1365.  But that was simply a colorful way of expressing the *Katz* exception – that disclosing a computer with no algorithm is permissible only if the computer inherently performs the function without an algorithm.  *See* pp. 29-31, *supra*.  In context, it is clear that *Ergo* did not purport to announce a new and narrower standard.  To the contrary, the opinion quoted extensively from *Katz*, and followed its reasoning faithfully.  *See id.* at 1364-65.

But even if one could read *Ergo*'s "merely plugging in a general-purpose computer" statement as espousing a narrower standard than *Katz*, that has nothing to do with this case.  As discussed above, the district court did not apply a "merely plugging in" standard, but instead provided EON the benefit of a far more expansive "off-the-shelf software" analysis.  (A1716-17.)

41

## II.  EON Cannot Rely on the Person Skilled in the Art To Supply the Algorithmic Structure It Has Failed To Disclose

EON devotes page after page to arguing that the viewpoint of a person skilled in the art must be considered when assessing the definiteness of a patent claim.  But there is no dispute that the person skilled in the art has a significant role to play.  EON just tries to give the person skilled in the art an improper role.

EON's argument boils down to this:  "the bounds of the computer-implemented means-plus-function terms in the '757 [Patent] were definite," even without disclosure of an algorithm, "because a person skilled in the art would understand the structure of those terms as the microprocessor disclosed in the '757 Patent and a routine, well-settled method within the art that even a person of elementary skill would understand and could implement."  (EONBr. 49.)[10]  This Court has repeatedly rejected that *precise* argument as "contrary to this court's law," holding that it "is not enough for the patentee simply to state or later argue that," without an algorithm, "persons of ordinary skill in the art would know what structures to use to accomplish the claimed function."  *Aristocrat*, 521 F.3d at 1334, 1337; *see also Noah*, 675 F.3d at 1312-19; *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384-85 (Fed. Cir. 2009); *Net MoneyIN*, 545

---

[10] EON does not, however, suggest that a person of skill in the art would understand the patent as requiring any *particular*, definitive method for implementing the functions, nor could it – its expert disavowed any such notion. *See* pp. 51-56, *infra*.

F.3d at 1366-67; *Med. Instr. & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211-12 (Fed. Cir. 2003); *Atmel*, 198 F.3d at 1380-82. EON's attempts to distinguish those cases are unconvincing. And nothing in the Supreme Court's recent decision in *Nautilus* calls those cases into question.

A.    **EON Fundamentally Misconstrues the Role of the Person Skilled in the Art**

EON's argument falters from the outset, because it misconstrues the role of the person skilled in the art in evaluating the sufficiency of means-plus-function claims. As discussed above, construction of a means-plus-function limitation involves two steps: "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Applied Med. Res. Corp.*, 448 F.3d at 1332 (internal citation omitted). The "'corresponding structure for a . . . claim for a computer-implemented function is the algorithm disclosed in the specification.'" *Aristocrat*, 521 F.3d at 1333 (quoting *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005)). The algorithm may be expressed in the patent "in any understandable terms," such as a "mathematical equation, in prose, or as a flow chart." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).

There is a significant, and straightforward, role for the person of skill in the art in this analysis. The "disclosure of algorithmic structure" in the patent

43

"must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart." *Aristocrat*, 521 F.3d at 1337; *see also Atmel*, 198 F.3d at 1380 ("interpretation of what is disclosed must be made in light of the knowledge of one skilled in the art"); *Katz*, 639 F.3d at 1317 ("The key inquiry is whether one of ordinary skill in the art would understand the patent to disclose structure that sufficiently corresponds to the claimed function, which in the case of a specific function implemented on a general purpose computer requires an algorithm."). If "the disclosed algorithm, from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable," then the claim is sufficiently definite to satisfy § 112. *Noah*, 675 F.3d at 1313. If the algorithm is not sufficient for the person of skill in the art to determine the bounds of the claim – or if it results in purely functional claiming by extending the patent to *all* means of achieving the function – it is indefinite. *See, e.g.*, *id.* at 1319.

EON seeks to utilize the person skilled in the art for a very different purpose – namely, to write the algorithms that the '757 Patent fails to disclose. It urges that, even where no algorithm is disclosed, the bounds of a computer-implemented means-plus-function term may still be sufficiently definite if a person skilled in the art "would understand that the function would be implemented by routine programming." (EONBr. 23.) This Court has long recognized that, while

44

it "is certainly true that the sufficiency of the disclosure of algorithmic structure must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart," "that principle . . . *has no application*" where, as here, "there was no algorithm at all disclosed in the specification." *Aristocrat*, 521 F.3d at 1337 (emphasis added); *see also Noah*, 675 F.3d at 1313; *Atmel*, 198 F.3d at 1381. The "understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure [*i.e.*, an algorithm] in the specification" in the first instance. *Atmel*, 198 F.3d at 1380. EON simply cannot invoke the person of skill in the art to supply the algorithm it has failed to disclose.

## B.   EON's Argument That a Person Skilled in the Art Could Custom Write a Program Confuses Definiteness With Enablement

Sifting through all the verbiage, EON's "real point is that devising an algorithm to perform" the claimed functions in the '757 Patent "would be within the capability of one of skill in the art, and therefore it was not necessary for the patent to designate any particular algorithm to perform the claimed function." *Aristocrat*, 521 F.3d at 1334; *see* EONBr. 49 (arguing that claims are definite because the undisclosed structure in the '757 Patent is "a routine, well-settled method within the art that even a person of elementary skill in the art *would understand and could implement*") (emphasis added). EON's argument fails because it "conflates the requirement of enablement under section 112 paragraph 1 and the requirement to disclose the structure that performs the claimed function

45

under section 112 paragraph 6." *Aristocrat*, 521 F.3d at 1336; *see also*

*Blackboard*, 574 F.3d at 1384-85.

This Court's decision in *Aristocrat* is on point.  That case involved the

definiteness of computer-implemented means-plus-function claims reciting

"control means" for various features of an electronic slot machine.  521 F.3d at

1330.  The only disclosed structure was a "standard microprocessor base[d]

gaming machine [with] appropriate programming"; the patent did not disclose an

algorithm.  *Id.* at 1331-33.  The Court accepted that a person of skill in the art may

well know, even without an algorithm, the "appropriate programming" disclosed as

necessary "to make and use the invention."  *Id.* at 1336.  But it stated that, whether

"the disclosure would enable one of ordinary skill in the art to *make and use* the

invention is not at issue . . . ."  *Id.* (emphasis added).  "Enablement of a device

requires only the disclosure of sufficient information so a person of ordinary skill

in the art could make and use the device."  *Id.*  But a "section 112 paragraph 6

disclosure . . . serves the very different purpose of *limiting the scope of the claim to

the particular structure disclosed*."  *Id.* (emphasis added).  And "the reference to

'appropriate programming,'" the Court held, "imposes no limitation whatever" on

which particular means of programming the patent covers.  *Id.* at 1334.  Thus,

regardless of whether a person skilled in the art would be able to supply the

"appropriate programming" necessary to implement the functions, in the absence of an algorithm, the claims were indefinite. *Id.* at 1337-38.

The Court reached a similar conclusion in *Blackboard*. The patent in that case claimed an Internet-based educational support system that included "means for assigning" levels of access to course materials. *See* 574 F.3d at 1373, 1382. The structure disclosed was an "access control manager." *Id.* at 1382-83. The Court, however, found that structure to be simply an "abstraction that describes the function" performed; it did not describe *how* to perform the function. *Id.* at 1383. The patentee argued that the claim was definite nevertheless because "the process of putting together control lists through software is well known to a person of ordinary skill in the art because access control lists 'have been around for a long time and everyone of ordinary skill in the field of this invention would know how to construct one.'" *Id.* at 1384-85.

As in *Aristocrat*, this Court rejected that argument in unequivocal terms:

> [The patentee's contention] conflates the definiteness requirement of section 112, paragraphs 2 and 6, and the enablement requirement of section 112, paragraph 1. The fact that an ordinarily skilled artisan might be able to design a program to create an access control list based on the system users' predetermined roles goes to enablement. The question before us is whether the specification contains a sufficiently precise description of the "corresponding structure" to satisfy section 112,

47

paragraph 6, not whether a person of skill in the art could
devise some means to carry out the recited function.

574 F.3d at 1384-85.  The Court found that the patent failed to disclose the

required structure, and was therefore indefinite.  *Id*. at 1385-86.

EON's argument here cannot be distinguished from the ones the Court

rejected in *Aristocrat* and *Blackboard*.  EON states that the claimed functions can

be achieved using a computer and invites one of skill in the art to write, with no

further guidance, custom software to implement the functions.  Its position that a

claim is sufficiently definite where the function requires implementation of "*some*

programming, the boundaries of which were clear and definite in the eyes of a

person skilled in the art," (EONBr. 49), is actually worse than the patentee's

position in *Aristocrat* that it was enough for the patent to reference "appropriate

programming."  521 F.3d at 1336-37.  And EON's plea that no algorithm is

required where a person of skill in the art would discern a "routine, well-settled

method within the art that even a person of elementary skill would understand and

could implement," (EONBr. 49), is a carbon-copy of the patentee's argument in

*Blackboard* that an algorithm was not required because the necessary "software is

well known to a person of ordinary skill in the art because access control lists

'have been around for a long time and everyone of ordinary skill in the field of this

invention would know how to construct one.' "  574 F.3d at 1384-85.  Here, as in

those cases, it "is not enough for the patentee simply to state or later argue that

persons of ordinary skill in the art would know what structures to use to accomplish the claimed function." *Aristocrat*, 521 F.3d at 1337.

### C. Relying on the Person Skilled in the Art To Supply the Necessary Algorithm Eviscerates the Means-Plus-Function Bargain

There is yet another fundamental reason this Court has consistently rejected attempts to rely on the "person skilled in the art" concept to supply the structure the patentee failed to provide. In *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946), the Supreme Court eliminated purely functional claiming. "A patentee cannot obtain greater coverage by failing to describe his invention," the Court stated, "than by describing it as the statute commands." *Id.* at 13. When Congress partially reinstated functional claiming in the 1952 Patent Act, it demanded a "*quid pro quo*" from the patentee. *Atmel*, 198 F.3d at 1381. The patentee may utilize "means expressions" and claim functionally without having to "recite in the claims all possible structures that could be used as means in the claimed apparatus." *Med. Instrumentation*, 344 F.3d at 1211. "However, the price that must be paid for that convenience is limitation of the claim to the means specified in the written description . . . ." *Id.* (quotation marks omitted). If the patentee fails to disclose a structure, the claim is indefinite. *See Atmel*, 198 F.3d at 1381-82.

EON argues that the disclosed structure of a general-purpose computer in the '757 Patent is sufficient, because the person skilled in the art,

"with her requisite level of knowledge, experience, and creativity," (EONBr. 45), "would understand the bounds of the claims," (*id.* at 49), despite the lack of an algorithm. But this Court has repeatedly held that, in the context of computer-implemented means-plus-function claiming, *providing an algorithm is the price the patentee must pay* for a claim to be valid under § 112, ¶ 6. Because "computers can be programmed to perform very different tasks in very different ways," the Court has explained, a patentee cannot decline to provide an algorithm to specify precisely the means of programming the patentee intends the claim to cover. *Aristocrat*, 521 F.3d at 1333. Absent such an algorithm, "the specification is not clear as to the structure that the patentee intends to correspond to the claimed function." *Id.* In that case, "'the patentee has not paid the price but is attempting to claim in functional terms unbounded by any reference to structure in the specification.'" *Id.* (quoting *Med. Instrumentation*, 344 F.3d at 1211). Just as a patentee with a mechanical patent cannot claim *all* means of achieving a function through purely functional claiming, a patentee with a computer-implemented patent cannot claim *all* means of achieving the function on a computer by disclosing no structure other than the computer.

Despite EON's protestations, the Court has clearly explained why this view of the "§ 112, ¶ 6 tradeoff . . . is not inconsistent with the fact that the knowledge of one skilled in the particular art may be used to understand what

structure(s) the specification discloses." *Atmel*, 198 F.3d at 1382. "While it is

undisputed that the question whether a claim is definite is based on how the claim

limitation would be understood by one of skill in the art, the testimony of one of

ordinary skill in the art cannot supplant the total absence of structure from the

specification." *Noah*, 675 F.3d at 1312. "The prohibition against using expert

testimony in this manner is a direct consequence of the requirement that the

*specification itself* adequately disclose the corresponding structure." *Id.* (emphasis

added).

> In *Blackboard*, the Court invalidated the claims because the disclosed

general-purpose computer was "essentially a black box that performs a recited

function. But how it does so [was] left undisclosed." 574 F.3d at 1383. The same

is true of EON's claims here. Providing an algorithm in the specification was the

price EON was required to pay in exchange for utilizing functional claiming.

EON's "efforts to find structure . . . in the common ken of a skilled computer

artisan does not allow it to 'avoid providing [the] specificity as to structure'

required by § 112, ¶ 6.'" *Noah*, 675 F.3d at 1317 (alteration in original) (quoting

*Blackboard*, 574 F.3d at 1385).

## III.   EON's Contrary Arguments Fail

> EON's fundamental premise is that disclosure of an algorithm is not

necessary "where a person skilled in the art would understand the bounds of the

51

invention" without an algorithm. (EONBr. 54.) That defies §112, ¶ 6 and long-settled principles from this Court.

EON also claims that the Supreme Court's *Nautilus* decision supports its argument, but that is not so. *Nautilus* held that claims should be "precise enough to afford clear notice of what is claimed." *See* 134 S. Ct. 2120, 2129 (2014). EON's position – that it was allowed to provide *less* disclosure than § 112, ¶ 6 requires – cannot be reconciled with *Nautilus*.

### A.    EON's Arguments Demonstrate Why an Algorithm Is Required

If EON is going to take advantage of means-plus-function claiming under § 112, ¶ 6, it must accept that provision's requirement that, to define the invention's bounds, the specification must disclose the relevant structure. *See Atmel*, 198 F.3d at 1381. EON cannot take the benefit of § 112, ¶ 6 without satisfying its prerequisites. Besides, in myriad decisions, including *Aristocrat*, *Katz*, *Noah*, *Blackboard*, and *Atmel*, this Court has *already determined* that, where the claim recites "specific functions that would need to be implemented by programming a general purpose computer to convert it into a special purpose computer capable of performing those specified functions," an algorithm *is necessary* for the person of skill in the art to understand the bounds of the invention. *Katz*, 639 F.3d at 1316. EON's arguments to the contrary are simply

52

disagreements over principles this Court has already resolved.[11]  And EON's own arguments prove the correctness of the Court's decisions.

EON claims, for example, that "if a computer-implemented term contains a function that is well-known in the art, a person skilled in the art might recognize the bounds of the claim as a combination of the hardware explicitly disclosed in the patent and as the well-settled, elementary algorithm that exists in the art."  (EONBr. 52.)  But that ignores the fundamental premise of the algorithm requirement:  "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6."  *Aristocrat*, 521 F.3d at 1333.  Instead, it results in the purely functional claiming the law forbids – it claims *all* means on a computer of achieving the function.

EON claims that, in this case, "the *methods* that a person skilled in the art would understand in reading the patent were elementary, settled ways of

---

[11] EON argues that cases such as *Aristocrat* and *Noah* are "inapplicable here because they address the question of whether there is sufficient structure to achieve the function after it has *already been determined* that an algorithm is necessary." (EONBr. 52.)  That is circular.  The holdings in those cases *themselves determine* when an algorithm is required in future cases – that is how legal precedent works.  To the extent EON is arguing that no algorithm is required because its claims fall into the *Katz* exception, *see id.*, that argument is refuted at pp. 31-34, *supra*.

performing the functions." (EONBr. 55.)  But that is non-responsive.  EON acknowledges "that both parties' experts conceded that multiple ways existed to program even the most basic computer functions." (*Id.*)  And as explained above, even if those various methods are elementary and settled, that in no way "limit[s] the scope of the claim to the particular structure disclosed." *Aristocrat*, 521 F.3d at 1336.

EON's own expert proves the point.  EON repeatedly invokes Dr. Sauer's testimony that "a person skilled in the art would utilize routine, settled algorithms known in the art to implement the functions at issue in this case." (EONBr. 54; *see also id.* at 49-50.)  Yet EON cannot explain how well-known functions can establish the bounds of the claim, nor can EON answer the basic question at the heart of the definiteness inquiry – which of the supposedly routine, settled algorithms that potentially could be used to implement the functions are covered by its claims, and which are not.  The specification simply "is not clear as to the structure that the patentee intends to correspond to the claimed function." *Aristocrat*, 521 F.3d at 1333 (citation and quotation marks omitted).  Thus, to the extent a person skilled in the art "would understand the bounds of the claims" at all (EONBr. 49), that person would understand EON to be "attempt[ing] to capture any possible means" of implementing the functions at issue. *Blackboard*, 574 F.3d at 1385.  Regardless of whether the means of implementing the functions at issue

are routine or elementary, the '757 Patent still "run[s] afoul of the rule against purely functional claiming." *Katz*, 639 F.3d at 1316.

EON nevertheless urges that, "[e]ven if more than one simple, elementary method existed, if it is known in the art, then it is not grounds for a finding of indefiniteness." (EONBr. 55.)  In support, it cites *Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004), which states: "That the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art." *Id.* at 1322.  But *Linear* is entirely distinguishable. The patent at issue in that case at least identified "a discrete class" of structures covered – a specific type of circuits known as "PWM circuits." *Id*.  The '757 Patent, by contrast, does not identify any particular "class" of algorithms as comprising the corresponding structure.  EON's argument is essentially that a person skilled in the art would recognize the class of structures covered as "appropriate programming" – which this Court rejected as indefinite in *Aristocrat*. 521 F.3d at 1334.

EON further argues that it is sufficient if a general-purpose computer can "achieve" the claimed function.  (EONBr. 42-43.)  This is nonsensical. Computers can be programmed in many different ways to "achieve" a function – which is precisely why an algorithm must be disclosed.  *See Blackboard*, 574 F.3d

at 1383 (finding computer-implemented function indefinite where the claimed device "is essentially a black box that performs a recited function. But how it does so is left undisclosed."). Thus, the mere fact that a general-purpose computer could "achieve" the recited function, so long as someone writes a computer program to implement it, does not limit the scope of the claim as required by § 112, ¶ 6.

### B. The Supreme Court's *Nautilus* Decision Does Not Alter the Analysis

Finally, EON argues that requiring disclosure of an algorithm on the facts of this case "is wholly inconsistent" with the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). (EONBr. 53; *see also id.* at 26-27, 43-45.) *Nautilus*, however, does not address the framework this Court has established for evaluating the definiteness of computer-implemented means-plus-function claims under § 112, ¶ 6. And nothing in that case calls into question the precedents – such as *Aristocrat*, *Katz*, *Noah*, *Blackboard*, and *Atmel* – that are controlling here. If anything, the principles underlying *Nautilus* counsel strict adherence to the algorithm requirement.

*Nautilus* addressed the general standard for definiteness under § 112, ¶ 2. 134 S. Ct. at 2124. The Supreme Court concluded that this Court's existing standard for definiteness did not sufficiently fulfill § 112, ¶ 2's "essential inquiry" – *i.e.*, providing the public with notice of the bounds of the claim. *Id.* at 2130.

56

Deciding that a "meaningful definiteness check" was required, *id.* at 2129, the Supreme Court held that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124.

EON asserts that, under *Nautilus*, "the touchstone of a definiteness determination is the viewpoint of a person skilled in the art, full stop." (EONBr. 53.) But *Nautilus* does not represent a "full stop" on the issue here. It did not address § 112, ¶ 6 and the "*quid pro quo*" Congress demanded in exchange for functional claiming. *Atmel*, 198 F.3d at 1381. Nor did it address the concerns unique to computer-implemented means-plus-function claiming that prompted the algorithm requirement. *See Aristocrat*, 521 F.3d at 1333.

This Court's decisions are entirely consistent with *Nautilus*'s holding regarding the role of the person skilled in the art. This Court's cases provide that, where the patent's "specification discloses some algorithm, . . . the question is whether the disclosed algorithm, from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable." *Noah*, 675 F.3d at 1313. This Court's decisions then go on to explain that, in the context of a computer-implemented means-plus-function claim, "that principle . . . *has no application*" where "there was no algorithm at all

disclosed in the specification," because *there is no structure for the person of skill in the art to evaluate*. *Aristocrat*, 521 F.3d at 1337 (emphasis added); *see also Noah*, 675 F.3d at 1313; *Atmel*, 198 F.3d at 1381. There is no inconsistency with *Nautilus*.

Rather, it is EON's position that is inconsistent with *Nautilus*. The Supreme Court sought to give the definiteness requirement teeth, tightening the standard to ensure that patents are "precise enough to afford clear notice of what is claimed." *See* 134 S. Ct. at 2129. In the context of a means-plus-function claim under §112, ¶6, the scope of the invention is statutorily defined by the patentee's disclosure of corresponding structure in the specification. 35 U.S.C. §112, ¶6 (requiring that "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof"). Because EON's patent discloses only a microprocessor, which is indisputably incapable of performing the functions here, it fails to offer the "precision" required under *Nautilus*. The knowledge of one of ordinary skill provides no cure for this deficiency.

## IV.    EON Relied on the Novelty of the Claimed Functions To Gain Allowance During Reexamination

EON states that algorithms must be disclosed at least when the algorithm provides the point of novelty in the claims: "The algorithm requirement itself is predicated on a distinction between what was known in the art and *new*

58

programming that added *novelty* to the art." (EONBr. 46.)[12]  It should therefore be noted that some of the very terms that EON now describes as "routine" and "simple" are the same functions that it used to gain allowance during reexamination.  During the first reexamination, EON gained the allowance of independent claims 1 and 8-10 by introducing the additional function of "reconfiguring the operating modes by adding or changing features and introducing new menus." (A1344-45; A1365-66; A1375.)  The examiner further allowed claim 7 because it recited "means under control of said replaceable software means for indicating acknowledging of shipment of an order." (A1344.)

Having argued for – and obtained – issuance of the '757 Patent based on the terms at issue, EON by its own admission had to disclose corresponding structure in the form of an algorithm.  Thus, the very arguments advanced by EON require a finding of indefiniteness of each of the independent claims.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The district court's judgment should be affirmed.

---

[12]  Although Defendants agree that algorithms must be disclosed, EON's suggestion that algorithms are required only at the point of novelty misses the point.  As discussed above, this Court has explained that the purpose of the algorithm requirement is to *limit the scope* of otherwise-boundless functional claims implemented on a computer, a concern that is not limited to allegedly-novel elements. *See Aristocrat*, 521 F.3d 1333 ("For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming.").

Respectfully submitted,

*/s/ Thomas W. Sankey*

Thomas W. Sankey
Diana M. Sangalli
Duane Morris LLP
1330 Post Oak Boulevard
Suite 800
Houston, TX 77056
(713) 402-3900
twsankey@duanemorris.com
dmsangalli@duanemorris.com

Joseph A. Powers
Duane Morris LLP
30 South 17th Street
One Liberty Place
Philadelphia, PA 19103
(215) 979-1842
japowers@duanemorris.com

Kristina Caggiano
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
(202) 776 5284
kcaggiano@duanemorris.com

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for AT&T Mobility LLC*

September 15, 2014

## **CERTIFICATE OF SERVICE**

I certify that on September 15, 2014, I caused the foregoing Initial Brief for Defendant-Appellee and accompanying Certificate of Interest to be electronically filed with the Clerk of the Court via CM/ECF, which will serve the registered CM/ECF appellees in this case.  I also served these documents on counsel of record via electronic mail.

*/s/ Thomas W. Sankey*
Thomas W. Sankey

# CERTIFICATE OF COMPLIANCE

This brief complies with the requirements of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32:

1.      Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), this brief meets the type-volume limitation because it contains no more than 14,000 words.  Specifically, it contains 13,508 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style.  Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.

*/s/ Thomas W. Sankey*

Thomas W. Sankey
Duane Morris LLP
1330 Post Oak Boulevard
Suite 800
Houston, TX 77056
(713) 402-3900
dmsangalli@duanemorris.com

Counsel for Defendant-Appellee

September 15, 2014

## <u>CERTIFICATE OF CORRECTION</u>

I certify that the foregoing Corrected Initial Brief for Defendant-Appellee was modified to include the names, addresses, and telephone numbers of counsel representing AT&T Mobility LLC per this Court's Order.  No other changes were made.

<u>/s/ Thomas W. Sankey</u><br>Thomas W. Sankey

## **CERTIFICATE OF SERVICE**

I certify that on September 19, 2014, I caused the foregoing Corrected Initial Brief for Defendant-Appellee and accompanying Certificate of Interest to be electronically filed with the Clerk of the Court via CM/ECF, which will serve the registered CM/ECF appellees in this case.  I also served these documents on counsel of record via electronic mail.

/s/ Thomas W. Sankey
Thomas W. Sankey